IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CITGO PETROLEUM CORPORATION | : | |
| | : | CIVIL ACTION |
| | : | NO. 13-202 |
| v. | : | |
| | : | |
| US LUBES, LLC | : | |

O'NEILL, J.                                                                                                                                                        August 8, 2014

## MEMORANDUM

Now before me are plaintiff CITGO Petroleum Corporation's motion for summary judgment, defendant's response and plaintiff's reply. For the reasons that follow, I will grant CITGO's motion.

## BACKGROUND

**I.  Amended Loan Agreement**

On April 23, 1997, CITGO entered into a loan agreement with Lincoln Fuels Company, Inc. to loan Lincoln $3 million. Pl.'s Mot. for Summ. J. ¶ 8, 12. In addition to the Loan Agreement entered into at that time, CITGO and Lincoln also entered into a Security Agreement and a Promissory Note. Id. at ¶ 10. On July 26, 2000 the Loan Agreement was amended to reflect that on April, 8 1998, defendant US Lubes assumed all of Lincoln's "interests, rights and obligations under the Loan Agreement and the Promissory Note." Id. at ¶ 15 quoting Am. Compl. ¶ 14. Between 2002 and 2006 the Loan Agreement was amended a further five times (the Loan Agreement with all of its amendments is referred to here as the "Amended Loan Agreement"). Id. at ¶ 16. The Amended Loan Agreement stated that it was "to be construed in accordance with the laws of Oklahoma." Id. at ¶ 18.

The Amended Loan Agreement provided that US Lubes was required (a) to "purchase in

aggregate thirty-one million four hundred thousand (31,400,000) gallons of lubricants from CITGO during the eleven (11) year period from calendar year 2002 to 2012" and (b) "to retain CITGO as [US Lubes'] primary lubricants supplier through December 31, 2012." Id. at ¶ 19. The agreement did not set a purchase price for the lubricants. Def.'s Opp'n Mem. at 1. If US Lubes failed to comply with the conditions specified in part (a) above it would be required to pay CITGO "six-hundred thousand dollars ($600,000) in shortfall damages…no later than January 31, 2013." Pl.'s Mot. for Summ. J. ¶ 19. If US Lubes failed to comply with the conditions specified in part (b) above it would be required to pay CITGO $600,000 "within 30 days after the date on which CITGO ceases to be [US Lubes'] primary lubricants supplier." Id. In addition, the Amended Loan Agreement specified that if US Lubes failed to purchase 2,740,000 gallons of lubricants from CITGO each year from 2006 to 2012, US Lubes would owe CITGO $48,000 per year in shortfall damages to be paid on January 1 of the subsequent year. Id. at ¶ 28.

In 2006 US Lubes purchased 3.2 million gallons of lubricants from CITGO, 500,000 gallons more than the required annual minimum volume of lubricants for that year. Def.'s Opp'n Mem. at 2. In 2007 CITGO shut down its Gulf Coast refinery and US Lubes contends that as a result CITGO raised the price at which US Lubes was required to purchase lubricants "above a level at which US Lubes could compete." Id.

Also in 2007 James Waugh, a CITGO employee, sent two emails to US Lubes stating that "I am working on providing US Lubes a letter stating that the principal balances [sic] of the loan has been repaid in full" and that "final Citgo debt payment will be made 5/25/07. James to write a letter stating US Lubes assumed Citgo debts have been extinguished." Def.'s Opp'n Mem., Ex. A at 5. The Chairman of US Lubes, William Packer, stated in his deposition that CITGO forgave the remaining balance on the loan out of fear of a lawsuit over CITGO's

charging unfair prices. Id. at 2.

CITGO ceased to be US Lubes' primary lubricant supplier in November of 2010. Id. at ¶ 20. US Lubes failed to pay CITGO the shortfall damages of $600,000 by December 31, 2010. Id. at ¶ 22. US Lubes also "failed to purchase in aggregate 31,400,000 gallons of lubricants from CITGO during 2002-2012." Id. at ¶ 24. US Lubes again did not pay CITGO the shortfall damages of $600,000 by the date specified in the agreement, January 31, 2013. Id. at ¶ 26. US Lubes also failed to purchase the annual minimum volume of 2,750,000 gallons of lubricants from CITGO for the years 2007, 2008, 2009, 2010, 2011 and 2012. Id. at ¶ 29-37. US Lubes did not pay CITGO the requisite shortfall damages by the date specified for any of the years in which it failed to purchase the minimum annual volume of lubricants; these damages amount to $288,000. Id. at ¶ 42. In 2012, US Lubes closed its operations and it claims that this was caused in part by the change in CITGO's pricing structure. Id.

## II.     Marketer Agreement

On August 1, 2000, CITGO and US Lubes entered into a Marketer Agreement also to be "construed in accordance with the laws of the state of Oklahoma." Pl.'s Mot. for Summ. J. ¶ 43-45. This agreement "obligated US Lubes to pay CITGO for goods delivered to US Lubes." Id. at ¶ 46. Pursuant to the Marketer Agreement, CITGO delivered $606,237.67 worth of goods to US Lubes for which it never received payment. Id. at ¶ 48. In 2013 US Lubes paid CITGO $102,944.93 toward the $606,237.67 owed. Id. at ¶ 48, 52. [1]

Packer claims that US Lubes's agreement with CITGO was for CITGO to charge them its

---

[1]     CITGO raises the issue in footnote 4 of Plaintiff's Motion for Summary Judgment that $20,000 of the $102,944.93 US Lubes paid to CITGO was "in exchange for CITGO's release of its interests in the titles of vehicles owned by US Lubes." Pl.'s Mot. for Summ. J. at n.4. However, all of CITGO's requests for relief on count two deduct the entire amount US Lubes paid to them, including the $20,000 from the amount owed; therefore, I deduct the entire amount here.

3

"price to marketers in effect on the date of shipment." Id. at 2. The Marketer Agreement states that "MARKETER shall pay CITGO's Marketer prices in effect on date of shipment." Pl.'s Summ. J. Mem., Ex. 9 at 1.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23. If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it might affect the outcome of the case under governing law. Id.

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on

unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

## DISCUSSION

### II. Count I

In Count I, plaintiff asserts a claim against US Lubes for breach of the Amended Loan Agreement.  US Lubes and CITGO are in agreement on the primary facts relevant to this count, namely that US Lubes did not meet the minimum purchase amounts specified in the contract nor did US Lubes pay CITGO the requisite shortfall damages for its not having done so.  However, US Lubes contends that (1) CITGO set prices that were not in good faith and therefore the contract was not in force when US Lubes failed to meet the minimum purchase amounts and (2) the loan was forgiven and therefore it was not required to pay the fees.

#### A. Good Faith

Under Oklahoma law,

> [G]ood faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant.  But in the normal case a "posted price" or a future seller's or buyer's "given price," "price in effect," "market price," or the like satisfies the good faith requirement.

Autrey Petrol. Co. v. BP Prod.'s N. Am., Inc., 334 F. App'x 982, 985 (11th Cir. 2009) quoting 12A Okl. St. Ann. § 2-305 UCC cmt. 3 (2014).  Generally, there is a presumption that in an open-price-term contract, the price has been set in good faith.  Id.  However, "the majority of courts who have had occasion to consider the 'normal case' good faith presumption have applied
5

it where the price charged was within the range of commercially reasonable prices and was applied non-discriminatorily to similarly-situated purchasers." Id. at 986.

CITGO's prices appear to fall within the "normal case" as there is no evidence CITGO charged US Lubes anything but its price in effect on the date when it shipped its products. In fact, Packer's declaration supplied by US Lubes states that the two companies agreed US Lubes would pay "CITGO's price to marketers in effect on the date of shipment." Def.'s Opp'n Mem., Ex. A at 5. Therefore, there is a presumption that CITGO set its prices in good faith. Autrey, 334 F. App'x at 985.

Accordingly, I must consider whether there is evidence that CITGO's price was not "commercially reasonable" such that US Lubes can rebut the presumption that CITGO's prices were set in good faith. Id. The only challenge to this presumption US Lubes presents comes from Packer's Declaration in which he states that after CITGO sold its refineries it began charging US Lubes "significantly higher prices" to the point that US Lubes "couldn't compete effectively" and their "business plummeted." Def.'s Opp'n Mem., Ex. A at 5.

Evidence of difficulty competing is not sufficient to show that a price is not within the range of commercially reasonable prices. Shell Oil Co. v. HRN, Inc., 144 S.W.3d 429, 437 (Tex. 2004).[2] The duty of good faith does not require that a company protect another from competition, nor that it keep the other company's interests in mind, but merely obligates it to charge a commercially reasonable price, i.e. "one within the range of [dealer tank wagon] prices charged by other refiners in the market." Id. at 434. In fact, "good faith under section 2.305(b) [of the UCC] does not mandate a competitive price for each individual Dealer, nor could it. The

---

[2] Texas has adopted the same statutory language as Oklahoma, taken from the UCC, on the issue of setting open contract terms in good faith. V.T.C.A., Bus. & C. § 2.305(b) (2013); 12A Okl. St. Ann. § 2-305 (2014).

competitive circumstances of each Dealer in the same pricing zone may vary from station to station, and yet [a supplier] must treat them all the same." Id. at 437.  Therefore, evidence that CITGO's pricing made it difficult for US Lubes to compete is not sufficient to raise a genuine question of fact as to whether CITGO priced its lubricants in good faith, as US Lubes has not shown that CITGO was charging a price outside the range charged by other refiners in the market.

In short, US Lubes does not dispute that CITGO charged it "CITGO's price to marketers in effect on the date of shipment," which is presumed under Title 12A §2-305 of the Oklahoma Statutes to be a good faith price.  Def.'s Opp'n Mem., Ex. A at 1.  Thus, the onus is on US Lubes to show that there is a genuine factual question as to whether CITGO's prices were not set in good faith and US Lubes has not met this burden.  Even at the summary judgment stage US Lubes must provide "more than a mere scintilla of evidence" that CITGO did not set its prices in good faith and a single declaration stating only that CITGO's prices increased making it hard for US Lubes to compete is the very definition of a "mere scintilla." Williams, 891 F.2d at 460.  More to the point, "courts have generally rendered judgment as a matter of law on similar claims under section 2–305 where the refiner used a posted price which it fairly applied to similarly-situated purchasers," and that is precisely the case here. Shell Oil, 144 S.W.3d at 437.  US Lubes provides no evidence that CITGO did not charge its posted price, or price in effect nor does US Lubes provide any evidence that CITGO's pricing was discriminatory, therefore there is no question of material fact as to whether CITGO set its prices in good faith.

    **B.  Loan Forgiveness**

Given that there is no question of material fact as to whether CITGO actually set its prices in good faith and that CITGO is presumed under Oklahoma law to have set its prices in

good faith, US Lubes can only defeat CITGO's motion for summary judgment if it can provide evidence sufficient to raise a question of material fact as to whether there was a valid agreement between CITGO and US Lubes to forgive the loan.

US Lubes contends that there was an agreement to "forgive the remaining balance owed under the Fifth Amendment" to the Loan Agreement in the form of an email exchange between a CITGO employee, James Waugh, and the Chairman of US Lubes, Art Alessandroni. Def.'s Mem., Ex. A at ¶ 8. CITGO argues that this email exchange was not sufficient to constitute an agreement to change the terms of the Loan Agreement.

Under Oklahoma state law "[a] contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise." 15 Okl. St. Ann. §237 (West 2014). Therefore, US Lubes can only claim the loan was forgiven if the emails between Waugh and Alessandroni constitute a contract with consideration altering the terms of the amended loan agreement. See Smith v. Minneapolis Threshing Mach. Co., 214 P. 178, 180 (Okla. 1923) ("A waiver, to be operative, must be supported by an agreement founded upon a valuable consideration"); 15 Okl. St. Ann. §2 (West 2014). In addition the emails must have been written by "parties capable of contracting" who each consent to the alteration and who are contracting for a "lawful object." Id. CITGO has not set forth any evidence to show that the parties were incapable of contracting, that they did not consent or that they were contracting for an illegal object, therefore, these requirements are not discussed herein. Instead, CITGO argues (1) that the email exchange was not an agreement but instead was an agreement to make an agreement and (2) that there was no consideration for forgiving the loan, therefore the email exchange is not a valid alteration to the contract.

In arguing that the email exchange was merely an agreement to make an agreement

8

CITGO points to Waugh's statement in his email to Alessandroni that Waugh is "working on providing a letter stating that the principal balances of the loan has been repaid in full."  Opp'n Mem. Ex. A at 5.  I agree with CITGO that when viewed in isolation Waugh's statement appears to show that the email exchange is only an agreement to make an agreement.  However, the email further states that "all future loan payment drafts have been cancelled," indicating that there is not only already an agreement to forgive the loan, but that this agreement has been put into practice.  Id.  Further, Alessandroni replies to the email stating that "[f]inal Citgo debt payment will be made 5/27/07" and "James to write a letter stating US Lubes assumed Citgo debts have been extinguished."  Id.  And there is no evidence that Waugh sent a reply objecting to this, ultimately pointing to the conclusion that the agreement to stop debt payments is already in place and the referenced letter would merely be a confirmation of the agreement.  Under Oklahoma state law a "contract must be interpreted as to give effect to the intention of the parties at the time of contracting, with the intention of the parties to be determined from the terms of the contract itself."  Pub. Serv. Co. of Okla. v. Burlington N. R.R. Co., 53 F.3d 1090, 1097 (10th Cir. 1995).  Since the first email states that future payment drafts have been cancelled and the second states the exact date on which the final payment will be made, the intention of both parties appears to be to stop repayment on the loan, regardless of whether an official letter to that effect was sent.  Therefore I find that the email exchange is an agreement to forgive the loan.  However, this agreement will only be enforceable if US Lubes provided CITGO with some consideration in exchange for CITGO's forgiving the loan.  15 Okl. St. Ann. §237 (West 2014); 15 Okl. St. Ann. §2 (West 2014).

     CITGO is certainly correct that there is no consideration for the loan's being forgiven on the face of the emails themselves.  Opp'n Mem. Ex. A at 5.  However, US Lubes provides a

declaration from William Packer, its Chairman, in which he states that CITGO forgave the remaining balance on the loan in exchange for US Lubes's not suing CITGO for charging unreasonable prices. Id. at 2-3. Thus, US Lubes contends that its forbearance from filing a lawsuit serves as consideration for CITGO's promise to forgive the loan. Under Oklahoma law, forbearance from filing a lawsuit can be sufficient consideration for a promise even when it is not discussed in an agreement. Estate of Hoobler, 925 P.2d 13, 16 (Okla. 1996) ("Although the agreement does not specifically provide that the [parties] are agreeing not to contest Hoobler's will in exchange for a share of her estate, it is implicit in the contract that the [parties] are attempting to avoid litigation through division of the estate."). Further, "all that a party must have is a reasonable belief that a claim is tenable for forbearance to bring a suit to constitute adequate consideration for a valid contract." Id. Therefore, if US Lubes could have reasonably believed that it had a tenable claim against CITGO for charging unreasonable prices, the email agreement will be valid.

      The only evidence that US Lubes provides for its contention that it could have reasonably believed it had a tenable claim against CITGO for charging unreasonable prices is Packer's statement that CITGO's pricing made it difficult to compete. However, given that non-competitive pricing for individual dealers is not a basis on which to find that a distributor has set prices in bad faith and that US Lubes provides no evidence about the prices CITGO charged at any time, US Lubes has not raised a material question of fact as to whether it had a tenable claim against CITGO. Shell Oil, 144 S.W.3d at 437. Therefore, the email agreement between CITGO and US Lubes is presumed to be invalid. There is no evidence of adequate consideration where there is no evidence that US Lubes could have reasonably believed that it had a tenable claim against CITGO which it forbore from bringing in exchange for CITGO's forgiving the loan.

As there is no question of material fact as to whether CITGO breached the Amended Loan Agreement by setting prices in bad faith, CITGO is entitled to Summary Judgment on Count I in the amount of $888,000. [3]

## I.     Count II

In Count II, plaintiff asserts a claim against US Lubes for breach of the Marketer Agreement. Neither CITGO nor US Lubes dispute that CITGO sold and delivered product to US Lubes worth $606,237.67 for which CITGO had received no payment prior to this lawsuit. Def.'s Opp'n Mem. at 4, n.1; Pl.'s Mot. Summ. J. at ¶ 48. It is similarly undisputed that in 2013, after this lawsuit was filed, US Lubes paid CITGO $102,944.93 toward this amount. Def.'s Opp'n Mem. at 4, n.1; Pl.'s Mot. Summ. J. at ¶ 51. Therefore, US Lubes admits that it owes CITGO $503,292.74 for goods delivered pursuant to the marketer agreement. Id. As US Lubes has admitted liability and there is no factual dispute between the parties as to Count II, I will grant summary judgment to CITGO and against US Lubes in the amount of $503,292.74.

## CONCLUSION

For the reasons outlined more fully above I will enter summary judgment in the amount of $1,391,292.74 in favor of CITGO. An appropriate Order follows.

---

[3] Summary Judgment will be entered for CITGO in the amount of $888,000 for Count I, $600,000 in shortfall damages for US Lubes's failure to retain CITGO as its primary lubricants supplier through December 31, 2012 and $48,000 per year in shortfall damages for the years 2007 through 2012 (totaling $288,000) due to US Lubes's failure to purchase 2,740,000 gallons of lubricants from CITGO in each of these years pursuant to the Amended Loan Agreement.